UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                               :      Chapter 13

CHARLES MANNO                                       :

            Debtor                                  :      Bankruptcy No. 08-15588bf

................................................

MEMORANDUM

................................................

A disputed, unsecured creditor, Schulman, Wiegmann & Associates, Inc.

("SWA"), has filed a motion to dismiss this chapter 13 case filed by Charles Manno as

filed in bad faith.  Citing section 1307(c), SWA alleges that the debtor cannot confirm a

plan because of non-compliance with sections 1325(a)(3) and (4).  The movant also refers

to the two unsuccessful chapter 13 bankruptcy cases filed by Mr. Manno's wife, Susan

Manno, and the pending chapter 7 case filed by S.E. Manno & Associates, Inc.

("SEMA"), Mrs. Manno's company, as evidence of Mr. Manno's abuse of the bankruptcy

process as a serial filer.  SWA also notes certain omissions in the debtor's bankruptcy

schedules as additional indicia of bad faith.  Finally, SWA asserts that Mr. Manno

defrauded it prepetition and that this bankruptcy filing is primarily an attempt by him to

avoid a state court jury trial on that issue.

The debtor opposes dismissal.  He maintains that his bankruptcy filing

stems from his loss of income and his inability to afford further state court litigation

concerning SWA.   He denies having any obligation to SWA, maintains that he

committed no fraud, and suggests that any errors in his bankruptcy schedules were

inadvertent.  He also contends that he is not responsible for his wife's business debts to

SWA and that his bankruptcy filing should not be considered as part of a pattern of serial filing undertaken by his wife and himself.

At the conclusion of the evidence, the standing chapter 13 trustee, through his counsel, did not support dismissal at this time. Although the trustee agrees with SWA that the debtor's proposed chapter 13 plan is not confirmable, and that a chapter 13 reorganization is problematic, the trustee preferred to allow the debtor to attempt to overcome his confirmation problems rather than dismiss the case at this early stage.

Based upon consideration of the evidence presented at an extensive evidentiary hearing, judicial notice of certain facts,[1] and the parties' post-trial submissions, I make the following factual findings in narrative format.

A.

In 2001, Mrs. Susan Manno incorporated a court reporting and litigation support company called S.E. Manno & Associates, Inc. ("SEMA"), with herself as sole shareholder, and with the corporation operating out of the basement of her residence. Audio at 11:25, 2:14.[2] Mr. Charles Manno, who otherwise ran his own door and window installation business, became an employee of SEMA, providing videography and

---

[1]Fed. R. Evid. 201 (incorporated into bankruptcy cases by Fed. R. Bankr. P. 9017). See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D. Ill. 1993); In re Paolino, 1991 WL 284107, at *12 n.19 (Bankr. E.D. Pa. 1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995).

[2]Citation to testimony will be to the audio recording of the evidentiary hearing as "Audio at hour:minute."

synchronization services.  Audio at 11:05-:06, 11:10-:11, 11:25.  Between 2003 and 2005, Mr. Manno may have performed as many as 100 jobs per year for SEMA.  Audio at 11:06, 11:27.

SEMA paid Mr. Manno between $45,000 and $60,000 annually for his services,[3] paid $11,000 for videography equipment, and purchased a one-year old used Mercedes station wagon for Mr. Manno's transport of the equipment, at a cost of about $47,000.  Audio at 10:43; 11:07-:08.  In addition, Mr. Manno acknowledged that SEMA derived funds were used to pay certain personal expenses of the Mannos, such as college tuition for their daughter, as well as auto payments and utility bills.  Audio at 11:15-:16.

SWA is a court reporting services company and it provided services for customers of SEMA beginning in 2001.  Audio at 9:47-:48, 9:50.  Pursuant to an agreement between them, SEMA paid SWA 85% of the invoiced amounts for SWA's services, but SEMA billed its customers 100% of the SWA invoices, retaining 15% essentially as referral and administrative fees.  Audio at 9:49.

SEMA was responsible for collecting the invoice amounts from its customers and was liable to SWA for 85% regardless of the success of SEMA's collection efforts.  Audio at 9:49.  SEMA's business model assumed that 15% retention of the invoice would be sufficient to be profitable, since it had few employees (the Mannos) and little overhead.

---

[3]Mr. Manno testified that he was paid $900 per week, audio at 11:07, while Mr. Wiegmann testified that Charles was paid $60,000 per year.  Id. at 10:43.  For the purposes of the instant dismissal motion, the exact amount is immaterial, as it is agreed that the debtor no longer earns any income from SEMA.

By June or July 2003, SEMA fell behind in its payments to SWA, owing approximately $210,000. Audio at 9:51, 9:54, 9:56. SEMA asserted that the delinquency arose because its customers were slow in paying their invoices. SWA believed that SEMA was misusing its collections and breaching its agreement. Thereafter, SWA alleges that Mr. and Mrs. Manno (separately or jointly) made oral promises to SWA regarding forthcoming payments from SEMA in order to induce SWA to continue to provide services, including transcripts ordered by SEMA customers. SWA's Motion to Dismiss, ¶¶ 8-17.

Specifically regarding Mr. Manno, SWA alleges that, in the fall of 2003, he told SWA's principal, Mr. Barry Wiegmann, that the Mannos would obtain a home equity loan and use the proceeds of that loan to pay SWA at least $50,000. Audio at 9:56-57. Mr. Wiegmann further testified that Mr. Manno repeated this promise to him again in January or February of 2004, after SWA sent SEMA a default letter demanding payment of $85,000. Audio at 9:56-57, 10:19. Mr. Wiegmann further averred that SWA relied upon this promise and upon Mr. Manno's apparent authority to make it, inducing it to continue providing services to SEMA despite being owed approximately $210,000. Audio at 9:57-58, 10:04, 10:45. Mr. Wiegmann then testified that in April 2004, Mr. Manno informed him that the Mannos would not seek a home equity loan and use the proceeds of that loan to pay SWA. Audio at 9:58.

Mr. Manno testified that he never promised Mr. Wiegmann that the Mannos would seek home equity financing to repay SWA; nor that he induced SWA to continue providing services. Audio at 3:03-3:08. Though Mr. Manno did acknowledge that the issue of a home equity loan did arise in two conversations with Mr. Wiegmann, he

4

maitains that both conversations occurred in April 2004, and in those conversations he never promised payment to SWA.[4] Audio at 3:02-:04. Those conversations occurred because Mr. Manno and Mr. Wiegmann met on various social occasions, including boat trips. Nonetheless, Mr. Manno averred that he considered SEMA as his wife's business, and that he did not discuss SEMA's obligations with Mr. Wiegmann, nor promise to assist SEMA in tendering payments to SWA. Audio at 3:18-:19.

In May 2004, SEMA and Mrs. Manno entered into a promissory note in favor of SWA for approximately $212,000, with interest to accrue at 8%. Audio at 10:04. Mrs. Manno personally guaranteed this note, but Mr. Manno did not. By October 2004, SEMA and Mrs. Manno defaulted in promised payments under the note. Audio at 10:04.

SWA thereafter commenced suit, on May 15, 2005, against SEMA as well as Mr. and Mrs. Manno in Superior Court of New Jersey, alleging against all defendants claims of breach of contract, "reasonable value of services provided," unjust enrichment, fraud in the inducement, fraud and theft of services. Ex. W-1; Audio at 10:04. By order dated January 4, 2007, in light of a jury verdict against Mrs. Manno, the Superior Court granted judgment in the total amount of $449,853.20, which included liability for breach of contract and fraud in the inducement, punitive damages in the amount of $100,000, and attorney fees and costs. Exs. W-2, W-3; audio at 10:06-:12.

The trial court, however, had previously dismissed all of SWA's claims against Mr. Manno upon summary judgment. On May 27, 2008, the trial court's grant of

---

[4]Fox Chase Bank filed a proof of claim in connection with its second mortgage lien on the Mannos property. The documentation attached to the claim includes an "Open End Mortgage" for $80,000 made on March 18, 2004. So it appears that the Mannos did use their home to obtain refinancing, but did not use the proceeds thereof to repay SWA as it apparently anticipated.

summary judgment in favor of Mr. Manno was partially reversed on appeal by the New

Jersey Superior Court, Appellate Division.  The state appellate court upheld summary

judgment as to all counts against Mr. Manno except for SWA's claims against him for

fraud and fraud in the inducement.  Those two counts were remanded for trial by jury.

Ex. W-5; audio at 10:08.  A jury trial was set to commence against Mr. Manno on

September 3, 2008, but trial was stayed by Mr. Manno's chapter 13 bankruptcy filing on

September 2, 2008.  Id., ¶ 27; audio at 10:16, 10:49.

In vacating their dismissal and remanding the fraud counts for trial, the

Superior Court of New Jersey explained that there were material facts in dispute and so

summary judgment was inappropriate.  Schulman Wiegmann & Associates, Inc. v. S.E.

Manno & Associates, Inc., 2008 WL 2167845, at *3 (N.J. Super. A.D. 2008).[5]  The state

appellate court further instructed that under New Jersey law, "'[a] promise to pay in the

future is fraudulent if there is no present intent ever to do so.'"  Id., at *4 (quoting Van

Dam Egg Co. v. Allendale Farms, Inc., 199 N.J. Super. 452, 457 (App. Div.1985)).  Such

fraudulent intent can be proven by circumstantial evidence.  Id.

Although the alleged promise by Mr. Manno to pay SEMA's obligation to

SWA was not in writing, and although New Jersey law generally limits enforcement of

promises to pay the debts of another solely to written promises, id., at *5 (citing N.J.S.A.

25:1-15), the state appellate court observed that New Jersey's statute of frauds regarding

promises to pay debts is inapplicable when the oral promise is made for the benefit of the

promisor.  Id.  In essence, the state trial court was directed upon remand to have a jury

---

[5]The parties introduced a copy of the appellate court decision as exhibit W-5.  I
shall refer to the reported decision.

determine: whether Mr. Manno indeed made a fraudulent promise to SWA, whether SWA

was induced by that promise to continue to provide services to SEMA, and whether Mr.

Manno acted for his own personal benefit, given his employment relationship with

SEMA.  As to that last issue, the appellate court explained, after reviewing the summary

judgment submissions made to the trial court:

> It is obvious that Charles Manno could certainly have been
> serving some personal interest or purpose when making the
> allegedly fraudulent misrepresentations about his intent to pay
> via the acquisition of a home equity loan.  Defendant was a
> company employee who received numerous benefits.  These
> included a weekly salary, a luxury company car and payment
> of expenses.  A jury could reasonably conclude that Charles,
> by inducing plaintiff to forestall enforcement of the SEMA
> debt, would continue to derive personal benefits that flowed
> to him from the corporation.  The revenue generated from the
> services provided by plaintiff would allow defendant to
> maintain his employment as well as the employee benefits he
> had become accustomed to receiving.

Id., at *5.

### B.

As mentioned above, Mr. Manno filed this chapter 13 case on September 2,

2008.  He disclosed a residence, located at 1066 Corn Crib Drive, Huntingdon Valley,

Pennsylvania, as owned jointly with Mrs. Manno as tenants by the entireties.  Schedule A.

He valued the residence at $300,000 and disclosed that it is encumbered by a first

mortgage and second mortgage, both held by Fox Chase Bank.  Id.  The Mannos owe

approximately $61,000 on the first mortgage and $76,000 on the second mortgage,

leaving approximately $162,000 in equity.  Schedule D.   The monthly payments on the

two mortgages are $1,025 and $723 respectively.  Amended Schedule J.   An action in foreclosure had been filed but was stayed by Mr. Manno's bankruptcy filing.  Audio at 10:53.

Mrs. Manno testified that the first mortgage was two months in arrears and the second mortgage three months delinquent.  Audio at 11:40, 2:32.  Mrs. Manno opined that she would cure the arrears by January 2009; Mr. Manno was less sanguine on this point, only "hoping for the best."  Audio at 11:41, 2:49-:50.  In addition, the real estate taxes are not escrowed with the mortgage payment and have not been paid.  Audio at 10:55.  The Mannos are current on utility payments, aggregating $1,123 per month.  Id.

Mr. Manno's bankruptcy Schedule B listed $347,600 in personal property assets, including five cars (the oldest is a 2001 F250 truck) with an aggregate valuation of $56,000.  See Schedule B.  All vehicles are titled in his name alone, except for a 2003 Toyota Forerunner that he owns jointly with his daughter, the latter paying all of the maintenance on that car.  Audio at 11:02.  Mr. Manno still owes about $8,700 on his 2007 Mazda CX7 vehicle, paying $442 per month.  See Schedules D, Amended Schedule J; audio at 11:37.  Vehicle insurance costs the debtor $564 per month for all of the vehicles except the truck.  Audio at 2:32-:33.

Mr. Manno initially testified that he owned a fifth car for his family of four adults for use as a "spare."  Audio at 3:10-:11.  But later he stated that although he uses the F250 truck for his window installation business, he also uses the Mazda, with its better gas mileage, to investigate potential jobs.  Audio at 3:11.  According to Mr. Manno's schedules, the Mazda was purchased in January 2007—the same month and year that judgment was entered against Mrs. Manno in favor of SWA.

8

Mr. Manno also owns a 1987 Chris Craft 50-foot vessel, purchased in 2003 for $300,000, now valued by him at $200,000, and encumbered in the amount of $172,400.  Bankruptcy Schedules B and D.  He and his wife also own two boat slips in Maryland, with no encumbrances and valued by him at $100,000.  <u>See</u> Schedules A, B and D.  In connection with the vessel, Mr. Manno incurs quarterly storage fees, semi-annual insurance fees, and annual real estate taxes of at least $241 per month.  Audio at 11:16; Sschedule J.[6]

After the bankruptcy was filed, Mr. Manno stopped paying the $1,400 monthly payment on the boat, but does not know the extent of his delinquency.  Audio at 10:53-:54, 11:35, 2:51, 3:26.  The vessel has been listed for sale through a broker since January 2008 with an asking price of $250,000, audio at 11:35, but Mr. Manno hopes that he need not sell the boat.  Audio at 11:33, 3:23-:25.  In April or May of 2008 he sold a different vessel solely owned by him for $18,000.  <u>See</u> Statement of Financial Affairs, # 10.

On Schedule C, Mr. Manno elected 11 U.S.C. § 522(b)(2), the federal exemption scheme under section 522(d), but did not claim any property as exempt. Federal exemptions would allow him a homestead exemption of $18,450.  11 U.S.C. § 522(d)(1).

Mr. Manno's largest scheduled claim is to SWA, listed on Schedule F as "2003-Wife's Business Debt" in the amount of $514,927.51.  Schedule F also identifies the obligation as a joint debt that is contingent, unliquidated and disputed.  SWA has filed

---

[6]Amended Schedule J identifies a monthly expense for "boat and slip insurance" of $241, and a boat mortgage payment of $1,431 per month.

a proof of claim against Mr. Manno in the amount of its judgment against Mrs. Manno. Audio at 10:17.  Mr. Manno thereupon filed an objection to SWA's claim.  See docket entries ##40, 43.  Thus, Mr. Manno intends to adjudicate his obligation to SWA, if any, in this bankruptcy forum via his claim objection.

Though Mr. Manno testified that he always paid his credit card debt in full each month, audio at 3:09, on cards that have since been cancelled, id. at 3:10, he revealed approximately $17,000 in credit card debt.  He noted on his Amended Schedule I that "[c]redit has dried up because of cancellation of four credit cards used to purchase parts, supplies and fuel."  He also scheduled approximately $43,000 in unsecured debt for prepetition legal services rendered.  All his unsecured debts were scheduled as joint obligations with Mrs. Manno.

Mr. Manno has worked for 37 years installing windows and doors.  Audio at 10:55.  He currently is the sole shareholder and employee of an entity, United Home Inspections, Inc., that he operates out of his home.  Audio at 10:55, 11:26, 1:59, 2:10.  He relies on window and door dealers for referrals for installation jobs; thus his income depends upon the ability of dealers to make referrals.  Audio at 11:03, 11:29.  After receiving a referral, Mr. Manno hires independent contractors to assist him in the installation work.  Audio at 10:56.

Mr. Manno originally disclosed a monthly income after expenses for himself and Mrs. Manno of $1,867.62 on Bankruptcy Schedules I and J; he later filed amended schedules reducing their combined net monthly income to only $141.29.  He explained at the hearing that this amendment was owing to a reduction in his income as a contractor from $4,500 to $2,500 per month, because of the current decline in the housing

market.  Audio at 10:56-:57.[7]  He stated that his initial scheduling of $4,500 per month in income on Schedule I was based upon his 2007 income.  Audio at 10:56.[8]  He testified that he had averaged 15.2 jobs per week several years ago, but in 2007 averaged seven jobs per week, and in the three months since the bankruptcy filing, had only 10-20 jobs total, for an average of only two jobs a week.  Audio at 10:56-:57.  He has not drawn any income from his company since he filed the bankruptcy case.  Audio at 1:57-:58.

As mentioned above, Mr. Manno also worked as a videographer for his wife's companies.  However, Mr. Manno claims that his window and door installation business is his only source of income now; he has not done any videography work in two years, though he still owns the equipment.  Audio at 11:05.  Family expenses are primarily paid from the current income of Mrs. Manno.  Audio at 1:58.  Mrs. Manno presently is employed as a director of trial support services by an entity called Veritext.  Audio at 2:48-:49.

Mr. Manno's Form 22C, see Fed. R. Bankr. P. 1007(b)(6), reveals that he is an an above-median income debtor with net disposable income as defined by section 1325(b)(2) at $4,126.74 per month.  Despite this, Mr. Manno has proposed a chapter 13 plan whereby he would pay $110 monthly for 60 months, with all secured creditors paid in an undisclosed manner directly by the debtor, including his two mortgage lenders.  If SWA's claim is allowed in its entirety, unsecured creditors will receive approximately 1% on their claims.  If SWA does not prevail on its claim, then the remaining unsecured

---

[7]Mr. Manno's expenses also decreased in the removal from Schedule J of $332 for health insurance, which had already been deducted from Mrs. Manno's income on Schedule I.

[8]His Statement of Financial Affairs #1, however, reported that his 2007 income was $15,024 and his 2008 income through August 2008 was $20,000.

creditors would receive approximately 10%.  SWA filed an objection to this plan, asserting that the plan did not comply with sections 1325(a)(3), (4) of the Bankruptcy Code.  See docket #27.

Amended Schedule I discloses that Mrs. Manno currently receives a net monthly salary of $4,865.  Ten percent of her salary is being garnished by SWA.  The Mannos share their home with two daughters, aged 19 and 25, audio at 11:38, but no contribution to household income was disclosed from either adult.

Mr. Manno acknowledged filing the instant bankruptcy petition on the eve of trial against him.  Audio at 10:48.  He said he had trouble paying bills and could not afford the pending trial.  Audio at 10:49-:50, 11:22-:23, 2:00-:01.  His wife's trial in the same matter lasted two weeks.  Audio at 3:01.  It is his understanding that, were this chapter 13 to continue, there will still be a trial in order to fix SWA's claim, but he believes this bankruptcy case would enable him to avoid the expense of a trial in New Jersey state court.  Audio at 10:50.

C.

S.E. Manno & Associates, Inc., SEMA, filed its own chapter 7 bankruptcy petition on August 5, 2005, docketed at Bankr. No. 05-30582, just over two months after SWA's lawsuit was filed against it.  Mrs. Manno states that she filed a bankruptcy petition on behalf of SEMA after experiencing difficulty in collecting corporate receivables.  Audio at 2:14-:16.  Approximately $47,000 in accounts receivable were the only assets disclosed by SEMA.  A total of $349,580.22 in unsecured or priority claims

12

have been filed against SEMA (but none by SWA, although it is listed as an unsecured
creditor). A chapter 7 trustee was appointed who is attempting to collect unpaid
receiveables on behalf of the corporate debtor.

Mrs. Manno filed an individual chapter 13 bankruptcy case on May 16,
2007, docketed at Bankr. No. 07-12874. Her motion to voluntarily dismiss was granted
by order dated September 20, 2007. Mrs. Manno testified that she dismissed this case
because her unsecured debts exceeded the limit for chapter 13 cases. Audio at 2:25-:27.

Mrs. Manno filed a second chapter 13 case on March 18, 2008, docketed at
Bankr. No. 08-11818. This case was dismissed on motion of the chapter 13 trustee for
debt limit ineligibility under section 109(e), by order dated July 31, 2008. Mrs. Manno
said she filed this second case on advice of counsel. Audio at 2:28-:29.

SWA had filed an adversary proceeding in Mrs. Manno's latter case,
alleging nondischargeability of its claim pursuant to 11 U.S.C. § 523(a)(2), (4) and (6).
Ex. W-4. The adversary proceeding was made moot after the main bankruptcy case was
dismissed.

In her second bankruptcy case, Mrs. Manno valued her residence at
$350,000. She had proposed a five year chapter 13 plan paying $414.64 per month,
despite reporting a negative monthly net income on Schedule J.

II.

Section 1307(c) provides that a chapter 13 case may be dismissed for cause.

13

Courts have long concluded that cause under section 1307(c) implies the requirement that

the chapter 13 case be filed in good faith.  See, e.g., Matter of Smith, 848 F.2d 813, 816

n.3 (7th Cir. 1988); In re March, 83 B.R. 270, 275 (Bankr. E.D. Pa. 1988).  As the Third

Circuit explained:

> It is clear that Chapter 13 contains no explicit good faith
> requirement.  Section 1307(c) provides, however, that Chapter
> 13 petitions may be dismissed "for cause."  11 U.S.C. §
> 1307(c).  The Seventh, Ninth and Tenth Circuits have held
> that lack of good faith in filing [a chapter 13 bankruptcy
> petition] is sufficient cause for dismissal under section
> 1307(c). . . .  We agree.
>
> As the Seventh Circuit has noted, however, "good faith is a
> term incapable of precise definition."  In re Love, 957 F.2d
> [1350] at 1355 [(7th Cir. 1992)].  As a result, we believe that
> "the good faith inquiry is a fact intensive determination better
> left to the discretion of the bankruptcy court."  Id.  We
> therefore join the Seventh, Ninth and Tenth Circuits in
> holding that the good faith of Chapter 13 filings must be
> assessed on a case-by-case basis in light of the totality of the
> circumstances. . . .  Factors relevant to the totality of the
> circumstances inquiry may include, among others, the
> following:
>
> > the nature of the debt . . .; the timing of the
> > petition; how the debt arose; the debtor's motive
> > in filing the petition; how the debtor's actions
> > affected creditors; the debtor's treatment of
> > creditors both before and after the petition was
> > filed; and whether the debtor has been
> > forthcoming with the bankruptcy court and the
> > creditors.

In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996) (citations and footnote omitted).[9]

---

[9]Since Lilley was decided, section 1325(a)(7), enacted by the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005, added the plan confirmation requirement that
"the action of the debtor in filing the petition was in good faith[.]"  This provision is applicable
in this 2008 bankruptcy filing.

At least one court has implied that the obligation of a chapter 13 debtor to

(continued...)

Although the manner in which claims against a debtor arose is a pertinent

consideration, the Third Circuit instructed that the fact one or more claims may not be

dischargeable under section 523(a) is not considered in the good faith calculus. Id. at 496

n.2. Rather the totality of the circumstances must be considered, including whether the

vast majority of the claims against the debtor are based upon fraudulent conduct. See In

re Myers, 491 F.3d 120, 126 (3d Cir. 2007).

In arguing that this bankruptcy case was filed in bad faith, SWA emphasizes

that it occurred the day before a state court jury trial was to commence. Although the

filing of a bankruptcy petition on the eve of a trial is "not necessarily in bad faith[,] . . .

---

[9](...continued)
commence a chapter 13 case in good faith now resides in section 1325(a)(7) rather than section
1307(c). In re Torres Martinez, 397 B.R. 158, 165 (B.A.P. 1st Cir. 2008). Another recent
decision applied section 1325(a)(7) to deny confirmation, but concluded that dismissal must be
based upon the traditional bad faith analysis implied in section 1307(c). See In re Gonzalez,
2008 WL 5068837 (Bankr. E.D. Cal. 2008). Still another recent decision concluded that section
1325(a)(7) "appears to be nothing more than a codification of the long-standing judge-made rule
and a corollary of § 1307(c). . . ." In re Shafer, 393 B.R. 655, 659 (Bankr. W.D. Wis. 2008); see
also In re Aprea, 368 B.R. 558, 566 (Bankr. E.D. Tex. 2007). Yet another decision treats section
1325(a)(7) as an additional statutory basis to dismiss a bad faith chapter 13 filing. In re Bland,
2008 WL 2002647, at *2 (Bankr. N.D. W. Va. 2008).
    One commentator has opined that the addition of section 1325(a)(7) simply
evidences congressional ratification of decisions, such as In re Lilley, imposing a good faith
filing requirement in all chapter 13 cases. Norton Bankruptcy Law and Practice 2d, § 125:5
(2006). Another commentator interprets this statutory provision as implying that a lack of good
faith filing means "that denial of confirmation, rather than dismissal, is the appropriate way to
prevent such conduct." 8 Collier on Bankruptcy, ¶ 1325.07A (15th ed. rev. 2006). Although the
issue of confirmation is not before me, I note that if a lack of good faith in filing a chapter 13
petition mandates a denial of confirmation, it would appear that this defect would be
irremediable. If so, a chapter 13 case in which the debtor is unable to confirm any plan warrants
dismissal under section 1307(c). See generally Carolin Corp. v. Miller, 886 F.2d 693, 700-01
(4th Cir. 1989) (reorganization futility warrants dismissal).
    Since the debtor does not seek confirmation of his proposed plan, as SWA seeks
dismissal under section 1307(c), and as the debtor does not argue that section 1325(a)(7) is
applicable, I shall apply the Lilley standard in resolving this contested matter without now
deciding whether section 1325(a)(7) imposes a different good faith standard, or replaces section
1307(c) as a basis for dismissal.

suspicious timing of a bankruptcy petition is an appropriate factor for a court to consider

in the bad faith analysis." In re Myers, 491 F.3d at 125. Here, the timing of the filing is

indeed relevant because the New Jersey state court system had been the forum for the

dispute between SWA and Mr. Manno for a number of years, and was very familiar with

the allegations made, the state law principles involved and the summary judgment

adjudication. The legislative history surrounding termination of the bankruptcy stay for

cause under section 362(d)(1) contains the following statement:

> [I]t will often be more appropriate to permit proceedings to
> continue in their place of origin, when no great prejudice to
> the bankruptcy case will result, in order to leave the parties to
> their chosen forum and to relieve the bankruptcy court from
> many duties that may be handled elsewhere.

S. Rep. No. 989, 95th Cong., 2d Sess. 50 (1978).

Based upon the above-quoted legislative history, courts have long

recognized that it is within the sound discretion of the bankruptcy courts to grant relief

from the automatic stay and thereby defer to a non-bankruptcy forum—which has

jurisdiction over the dispute, and in which significant time and funds have already been

expended—the resolution of pending litigation involving state law issues. See, e.g., In re

Robbins, 964 F.2d 342, 345-46 (4th Cir. 1992); Matter of Holtkamp, 669 F.2d 505 (7th

Cir. 1982); In re Castlerock Properties, 781 F.2d 159, 163 (9th Cir. 1986); In re Olmstead,

608 F.2d 1365 (10th Cir. 1979); In re Hoffman, 33 B.R. 937 (Bankr. W.D. Okla. 1983);

In re Philadelphia Athletic Club, Inc., 9 B.R. 280 (Bankr. E.D. Pa. 1981).

In this contested matter, not only was the state court poised to try the

dispute between SWA and the debtor, but that dispute only involves state law issues of

fraud, and its resolution is necessary for the administration of this chapter 13 case. SWA

16

has already filed a nondischargeability complaint under section 523(a) and objected to the

debtor's proposed chapter 13 plan; the debtor has objected to SWA's proof of claim

contending that he owes that entity no debt.  If the debtor is correct, SWA has no valid

objection to confirmation and it cannot hold a nondischargeable claim.  If SWA is correct,

then its claim may be substantial, and it would be nondischargeable under sections

523(a)(2) and 1328(a)(2).  Therefore, whether SWA holds a claim against Mr. Manno

based upon fraud must be decided as part of the debtor's reorganization under chapter 13.

And, for reasons stated above, the state court forum is the more appropriate venue.  See,

e.g., In re Glunk, 342 B.R. 717, 741-42 (Bankr. E.D. Pa. 2006) (medical malpractice

action, long pending in the state court, and subject to a nondischargeability complaint,

should be tried in the state court system).

        Despite this, the evidence supports SWA's contention that Mr. Manno filed

this bankruptcy case in an attempt to obtain a federal forum for his dispute.  Otherwise, he

could have allowed the state court trial to proceed as scheduled.  In addition, I discount

his explanation that he was seeking to save the cost of trial, since he acknowledges that he

would have to underwrite the expense of trial if it were to occur in this forum.[10]

        Therefore, the debtor's timing of the bankruptcy petition was undertaken to

"forum shop."  That is, Mr. Manno decided that a resolution of SWA's state law fraud

claims would be preferable to him if decided in the context of an objection to a proof of

---

[10]The timing of the bankruptcy filing was also important to avoid issues of
eligibility for chapter 13 relief under section 109(e).  A prepetition judgment against him in an
amount equal to the judgment against Mrs. Manno would far exceed the chapter 13 debt ceiling
for unsecured claims.

claim, or nondischargeability dispute, in a federal bankruptcy forum rather than before the jury in state court.

As the Third Circuit implied in Lilley when it identified the timing of the petition and the debtor's motive in filing as relevant considerations, such conduct can represent an abuse of the bankruptcy system when the state court is ready to act.  See In re Myers, 491 F.3d at 125 ("[S]uspicious timing of a bankruptcy petition is an appropriate factor for a court to consider in the bad faith analysis."); In re Henson, 289 B.R. 741, 751 (Bankr. N.D. Cal. 2003) (finding bad faith in filing to "thwart[] the District Court trial" and "impos[e] delay and expense upon Creditor").

Here, Mr. Manno's bankruptcy filing has the following effect: if the bankruptcy case continues, SWA will likely seek relief from the bankruptcy stay so it can proceed in state court; such relief, as noted above, would likely be granted because the state court trial was about to commence after more than three years of litigation, and SWA is entitled to seek a jury verdict on its tort claims.  See generally In re Glunk.  If SWA were to prevail in state court litigation against Mr. Manno, then it must return to this court to prosecute its nondischargeability proceeding, given the provisions of section 523(c) affording exclusive jurisdiction of that issue in this court.  The result would be added time and expense to that creditor.

Filing a bankruptcy case in order to forum shop is but one factor in the bad faith matrix.  See In re Fonke, 310 B.R. 809, 816-17 (Bankr. S.D. Tex. 2004).  This factor, though, is joined in this contested matter with the nature of the alleged obligation to SWA, fraud, plus Mr. Manno's numerous difficulties in reorganizing under chapter 13,

and his lack of effort in reducing unnecessary expenses.  Taken together, these

circumstances support dismissal of this case.[11]

At the outset, I note that Mr. Manno's presently proposed chapter 13 plan

could not be confirmed due to section 1325(a)(4): referred to as the "best interest of

creditors test."  In essence, a chapter 13 plan must provide unsecured creditors with a

dividend at least equal to the amount those creditors would receive in a chapter 7

liquidation.  See generally In re Solomon, 67 F.3d 1128, 1132 (4th Cir. 1995); In re

Nevins, 2005 WL 984182, at *4 (Bankr. E.D. Pa. 2005).  The ability of a bankruptcy

trustee to sell entireties property under section 363(h) can be considered in applying

section 1325(a)(4).  See In re Sotter, 28 B.R. 201, 205 (Bankr. S.D.N.Y. 1983).[12]

Here, Mr. Manno discloses on his schedules $131,000 equity in real

property — his one-half interest in property held by tenants by the entirety (residence and

boat slips) that would be attributable to him if the trustee sold this realty pursuant to

363(h).  In addition his schedules reveal another $74,000 in equity in the vehicles and the

pleasure boat.  Even if Mr. Manno were to amend his Schedule C to claim the various

exemptions permitted him under section 522(d), there appears to be a much greater

---

[11]In deciding that dismissal is warranted, I do not conclude that Mr. Manno acted
fraudulently regarding SWA.  That issue will be the state court to determine.

[12]"In those cases where entireties property is not exempt . . . the trustee may
obtain authority to sell the property, including a nondebtor spouse's interest, pursuant to section
363(h)."  4 Collier on Bankruptcy, ¶ 522.10[3], at 522-78.2 (15th ed. rev. 2007) (footnote
omitted).  Under Pennsylvania law, entireties property is not exempt as to joint creditors.  See
Napotnik v. Equibank and Parkvale Savings Ass'n, 679 F.2d 316 (3d Cir. 1982).  As noted
earlier, Mr. Manno lists all of his creditors as holding joint obligations.

dividend payable to unsecured creditors in a hypothetical chapter 7 case then the $6,600

proposed under Mr. Manno's chapter 13 plan.[13]

Furthermore, the debtor's amended Schedules I and J reveal very limited

net monthly income.  Indeed, Mr. Manno testified that his earnings had decreased since

the bankruptcy filing.  Therefore, it is not apparent that he can amend his chapter 13 plan

to satisfy the requirements of section 1325(a)(4) while also complying with the feasibility

requirement of section 1325(a)(6).

In addition, the chapter 13 trustee alluded to the possibility that he may raise

a confirmation objection under section 1325(b), given the amount of the debtor's

disposable income on his Form 22C.  See generally In re Redley, 2008 WL 597947

(Bankr. E.D. Pa. 2008).  If so, this could be another statutory basis to conclude that the

debtor's offer of payments to unsecured creditors of $110 per month is deficient.

Although forum shopping and an apparent lack of ability to reorganize

under chapter 13 are sufficient in some instances to establish cause to dismiss under

section 1307(c), I also note that Mr. Manno's proposed chapter 13 plan seems to permit

him to retain possession of his boat and his five vehicles.  Such retention does reflect a

lack of a good-faith commitment to repay creditors an amount this debtor can afford.  See

In re Harter, 397 B.R. 860, 864 (Bankr. N.D. Ohio 2008) (chapter 13 debtors are expected

to do some belt tightening).

I appreciate that Mr. Manno testified that his boat has been placed with a

broker for sale.  His proposed plan, however, does not provide for such sale.  Moreover,

_____

[13]Thus, I need not now opine whether a hypothetical chapter 7 trustee could meet
the requirements of section 363(h)(3) as to the Mannos' residence.  See generally In re Persky,
893 F.2d 15, 21 (2d Cir. 1989).

the current economic climate makes a prompt sale problematic; thus, unless the secured

creditor obtains relief from the bankruptcy stay, Mr. Manno appears content to continue

in possession of the vessel for some time and incur the expenses associated with such

ownership.  His actual desire to reduce those expenses immediately might have been

better reflected by proposing in a chapter 13 plan to surrender the vessel to the mortgagee

as permitted by section 1325(a)(5)(C).  Similarly, Mr. Manno has elected to retain five

vehicles including the Mazda automobile, even such ownership is costly and not essential

to his business or family obligations.

These actions suggest that Mr. Manno was more concerned about litigating

the SWA fraud claims against him in this forum rather than reducing unnecessary

expenses to repay creditors in a chapter 13 reorganization.

In sum, in applying the totality of circumstances required by In re Lilley, I

find that Mr. Manno's forum-shopping, see In re Silberkraus, 253 B.R. 893, 902-03

(Bankr. C.D. Cal. 2000), together with his apparent inability to fund a reorganization plan

under section 1325 and his apparent lack of intention to repay creditors by minimizing

unnecessary expenses, demonstrate cause to dismiss under section 1307(c)(5).  See In re

Myers, 491 F.3d at 125.[14]

As no party suggests that conversion rather than dismissal is appropriate, an

order dismissing this case will be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: January 30, 2009

---

[14]Therefore I need not address SWA's allegations that this filing represents a serial
filing, or that Mr. Manno's omissions in his bankruptcy schedules are additional indicia of bad
faith.

21